[Cite as *In re J.B.*, 2016-Ohio-5513.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103521**

**IN RE: J.B., ET AL.**
**Minor Children**

[Appeal by Mother]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-12-920766; AD-12-920767; AD-12-920768;
AD-12-920769; AD-12-920770; and AD-15-901138

**BEFORE:** Laster Mays, J., Kilbane, P.J., and McCormack, J.

**RELEASED AND JOURNALIZED:** August 25, 2016

**ATTORNEY FOR APPELLANT**

Anita Barthol Staley
7327 Center Street
Mentor, Ohio 44060


**ATTORNEYS FOR APPELLEE**, **C.C.D.C.F.S.**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Willie Mitchell
Assistant Prosecuting Attorney
3955 Euclid Avenue, Room 305E
Cleveland, Ohio 44115


**ATTORNEY FOR THE CHILDREN**

Amy L. Nash
1180 Winston Road
South Euclid, Ohio 44121


**GUARDIAN AD LITEM FOR THE CHILDREN**

Gregory K. Boop
Lougovskaia Boop L.L.C.
6100 Oak Tree Boulevard, Suite 200
Independence, Ohio 44131


**FOR K.H. AND D.H.**

K.H. and D.H., pro se
103 Crescent Street
Gorman, Texas 76454

**FOR R.B.**

R.B., pro se
1621 Galion Avenue
Cleveland, Ohio 44109


**FOR JOHN DOE (ALLEGED FATHER OF JAY.B.)**

John Doe
c/o Juvenile Court Clerk's Office
9300 Quincy Avenue
Cleveland, Ohio 44106

ANITA LASTER MAYS, J.:

{¶1} Appellant Mother appeals the juvenile court's decision granting legal custody of her six children to the maternal aunt ("K.H.") and uncle ("D.H."), Texas residents, instead of to the children's Cleveland-based paternal aunt, T.B., who attempted to intervene in the custody action. A review of the record supports the trial court's decision; therefore, the trial court's order is affirmed.

## I.  PROCEDURAL AND FACTUAL HISTORY

### A.  Summary Background

{¶2} Cuyahoga County Department of Children and Family Services ("Agency") filed a complaint on December 14, 2012, for protective supervision alleging that the children, all under the age of 10 (R.B., d.o.b. 11/23/04; A.B., d.o.b. 07/26/08; Jes.B., d.o.b. 10/12/09; Ju.B., d.o.b. 06/09/11; and Jen.B., d.o.b. 11/30/12), were abused and neglected children. Mother and Father have suffered from long-term substance abuse issues, and Father also suffers from cognitive limitations.

{¶3} R.B., the oldest boy, has special needs and receives counseling twice a week. R.B. exhibits extreme anger and was once hospitalized for observation when he threatened to hang himself with a belt. Jes.B., has a "lazy eye," and both Jes.B. and A.B. receive counseling. R.B. and A.B. also require educational intervention.

{¶4} The court adjudged the children to be abused and neglected on February 20, 2013. Mother concurred with the court's award of legal custody to her and protective custody to the Agency. After a January 17, 2014 hearing, the court granted the Agency's motion to modify protective supervision to temporary custody to the Agency. During 2014, the parents failed to make significant progress in their case plan compliance, and the Agency filed a motion to modify

temporary custody to permanent custody to the Agency on October 3, 2014. Father failed to express an interest in participating in the custody proceedings until 12 days prior to the July 2015 dispositional hearing.

{¶5} The maternal grandmother notified the Agency that her brother K.H. and sister-in law D.H., the children's great-uncle and great-aunt who reside in Texas, were interested in obtaining legal custody. An investigation was initiated by a Texas social service agency to determine the suitability of K.H. and D.H. for custody. On November 28, 2014, Mother gave birth to a sixth child, Jay.B., who was born two months prematurely, was suffering from withdrawal symptoms, and had multiple physical issues. The Agency filed a complaint to have Jay.B. declared neglected and dependent.

{¶6} The Texas agency issued a positive investigative report for K.H. and D.H., and the children began visiting the Texas relatives in February 2015. On March 11, 2015, the Agency filed a motion to modify the pending permanent custody motion to award legal custody to K.H. and D.H. Also on that date, the court held the adjudicatory hearing for Jay.B.

{¶7} At the hearing, Mother stipulated to: (1) testing positive for opiates at the time of Jay.B.'s premature birth and Jay.B.'s withdrawal symptoms; (2) the removal of the remaining children from the home by the Agency due to Mother's substance abuse issues resulting in the pending custody action; (3) recently testing positive for opiates and requiring a treatment program; (4) the need to maintain sobriety and obtain housing in order to provide safe and adequate care for the infant; and (5) the fact that paternity had not been established as a matter of law nor had Father (who is the alleged father) supported, visited or communicated with the infant. Jay.B. was adjudicated neglected and abused, and the dispositional hearing on the

Agency's request to grant legal custody of the children to K.H. and D.H. was scheduled for July 28, 2015.

**{¶8}** T.B. also began visiting with the children in February 2015. Mother's attorney filed a motion on behalf of Mother requesting that legal custody be granted to T.B. On July 21, 2015, counsel for T.B. filed a motion to intervene to seek legal custody on behalf of T.B.

**{¶9}** On July 23, 2015, the Agency filed a motion opposing T.B.'s request to intervene on the grounds that: (1) T.B. failed to comply with Civ.R. 24(C); (2) T.B. was not a party as defined by Juv.R. 2(Y); (3) T.B. possessed no legally protected interest in the case or the children as required by Civ.R. 24(A); and (4) the Agency and the guardian ad litem ("GAL") already represented the children's best interests. Finally, the Agency argued that there was no basis for permissive intervention under Civ.R. 24(B).

### B. Guardian Ad Litem Report

**{¶10}** The July 22, 2015 report of the GAL documents the GAL's in-depth investigation on behalf of the children. The report states that K.H. and D.H. are well able to care for the children. The couple own an eight-bedroom home and yard, receives a sufficient and consistent stream of income, and purchased a van to transport the family. They have also purchased bicycles and toys for the children. Neither K.H. nor D.H., nor the extended family members who reside nearby, have a criminal record, or issues with drugs or alcohol.

**{¶11}** The children were bonding with K.H. and D.H. by the time of the in camera meeting with the GAL. An extended Texas visit took place from May through July 8, 2015, and the children reportedly thrived. R.B.'s anger issues dissipated. The children told the GAL that they do not want to return to Cleveland.

**{¶12}** The GAL's investigation of T.B. revealed that she is unmarried and resides with her fiancé ("D.M."). T.B. presented a month-to-month lease for a house. T.B.'s son occupies the furnished attic area of the residence, and her 11-year-old daughter also resides in the home. These parties, in addition to the six children, would reside in the three-bedroom home, constituting what the GAL described as "extremely cramped" circumstances. The GAL also observed that, according to the public record, T.B. had been evicted from her prior residence. T.B. also receives a monthly disability payment of $1,300 due to a medical issue.

**{¶13}** The GAL was concerned that the geographic proximity of T.B.'s residence to those of the parents would provide easy access to the children that could be problematic. The GAL had no doubt about T.B.'s sincerity but strongly believed that awarding custody to K.H. and D.H. was in the best interest of the children.

### C. Dispositional Custody Hearing

#### 1. Motion to Intervene or for Legal Custody

**{¶14}** The dispositional hearing for all of the children was held July 28, 2015. Counsel for T.B. presented her argument in support of the motion to intervene. Counsel offered that T.B. was an integral part of the Cleveland family unit, attended visits with the children during the pendency of the case, and that counsel for Mother had already filed a motion expressing her desire that legal custody be awarded to T.B.

**{¶15}** The trial court denied T.B.'s motion to intervene, holding that T.B. has never stood in loco parentis for the children, nor exercised significant control over the children, or assumed parental duties for the benefit of the children. T.B.'s counsel was permitted to remain in the hearing, and T.B. later testified as a witness for Mother.

{¶16} Counsel for Mother stated that placement with T.B. would be better for the children and that placement in Texas was akin to granting permanent custody because visitation with the children would be difficult. Finally, counsel requested that if the Texas relatives were granted custody, reasonable visitation be arranged.

### 2. Social Worker Testimony

{¶17} Lydia Clayton ("Clayton") served as the ongoing Agency social worker since October 2014. The case investigation was completed in March 2015. The Agency's permanency plan was that legal custody be awarded to K.H. and D.H.

{¶18} Clayton testified that Father lives with his mother, has a substance abuse history, and has failed to attend parenting classes, complete drug screens and assessments, or to make substantial progress on his case plan. Father has also refused to meet with Clayton after his sporadic visits with the children to discuss the case plan.

{¶19} Mother, who consistently visited the children, has an extensive substance abuse history and has given birth to four drug-exposed children. Mother, who suffers from depression and anxiety, has failed to complete a drug treatment program, a mental health assessment, and parenting classes. To Clayton's knowledge, Mother is not employed and reportedly lives with an aunt; however Mother never allows Clayton to visit her.

{¶20} T.B. has attended visits with the children and sometimes brings food. The girls were more familiar with T.B. than the boys, and at some point in their lives, T.B. lived with the children. T.B. moved to a larger, three-bedroom home to accommodate the children. Clayton also testified that the three female children had been allowed to attend a weekend home visit with T.B. T.B. secured medical attention and paid for prescriptions as one of the girls arrived with a

urinary tract infection and another with an ear infection, though the girls returned from the visit with pink, blue, and purple matted hair.

{¶21} T.B. and fiancé D.M. receive social security disability income. T.B. and D.M., T.B.'s daughter and the six children would live in a three-bedroom home at an address used by D.M. since 1996. T.B. has recently obtained a driver's license, and her drug screens were negative.

{¶22} K.H. and D.H. traveled to Cleveland multiple times to develop a relationship with the children. The Texas agency has provided a positive report on their suitability. The couple has an eight-bedroom home with a large yard. A great-grandmother, who is legally blind, also resides with K.H. and D.H. Her vision only limits her ability to drive but not general life activities. Adult relatives in the area are also available to assist with the children. K.H. is employed full time as a mill worker, and D.H. is employed as a school bus driver during the school year. Clayton also stated that K.H. and D.H. would be flexible with parental visitation.

{¶23} Clayton confirmed that the Texas agency handled the investigation of the suitability of K.H. and D.H. and provided her with information. Background tests had not been conducted on all of the adults who might possibly assist K.H. and D.H. if needed because those individuals were not currently listed as caregivers. Two foster children, ages 1 and 2, who were removed from their birth home due to sexual issues, also reside temporarily with K.H. and D.H. Mother and children have been allowed to call each other while the children are in Texas without restriction. T.B. has also been permitted to speak with the children while they are in Texas but Clayton expressed concern that the motive for the conversations is primarily to inform the children what T.B. has waiting for them at her house, as though attempting to bribe them.

**{¶24}** The social worker did not feel that the distance would prevent visitation with the parents. Clayton also opined that the parents should not be around the children while still using heroin.

**{¶25}** Jay.B. still has a number of health concerns and may be considered a special needs child. His eyes are crossed, his toes are fused, and he suffers from a genetic disorder that affects his skin and central nervous system and kidney reflux.

**{¶26}** The four oldest children told Clayton that they want to stay in Texas, while the fifth stated the Friday before the hearing that she wanted to live with T.B. The oldest boy, R.B., is upset about returning to Cleveland, and has asked whether he will see his parents one more time and whether he will have to see them after that. R.B. is extremely concerned that he will not be allowed to return to Texas after the current Cleveland visit.

### 3.     K.H. and D.H.

**{¶27}** K.H. and D.H. confirmed that K.H. is the maternal grandmother's brother. The couple own a large, mortgage-free home and yard in Texas, and they will provide a financially and emotionally stable environment for the children. K.H. earns about $1,000 weekly, excluding overtime, and his employer will provide health insurance coverage for the children. D.H. will care for the children full-time, along with the grandmother and, if needed, will be assisted by extended family members as well as their church family. D.H. is taking online college courses toward a degree in psychology, has an associate's degree, and she and D.H. have cared for children for more than 20 years, including several with special needs.

**{¶28}** The two foster children who currently reside with K.H. and D.H. may reside with them on a very short-term basis and neither has special needs. K.H. and D.H. maintain a close relationship with their three married daughters who do not reside in town. K.H., D.H., and the

children have formed a strong bond and participate in family activities such as swimming, horseback riding, biking, and water parks.

{¶29} The children will attend a reputable local public school that is equipped to meet their special needs. D.H. also contacted Cook Hospital, a leading pediatric facility, that is able to care for the children's mental and health needs. D.H. and Clayton stay in touch at least weekly, and Clayton also speaks with the children. K.H. and D.H. are in favor of reasonable visitation with the parents but are not comfortable with allowing extended unsupervised visits with them in light of the parents' substance issues.

### 4. T.B. and D.M.

{¶30} T.B. is Father's sister, and has had a relationship with Mother and children for years. D.M. and T.B. have been engaged for 12 years. D.M. knows the parents and the children. T.B. testified that, in March 2015, Clayton asked her whether she was interested in obtaining custody of the children. Clayton informed T.B. of the steps required to seek custody including seeking a larger home. T.B. did not seek custody prior to that time because she believed the children were going to be returned to Mother.

{¶31} T.B., D.M., and T.B.'s 19-year-old son passed the Agency's background checks. T.B. presented a month-to-month lease for the residence; however, D.M. testified that there is no lease because the home is owned by his mother. For sleeping arrangements, D.M. would sleep in a room off of the kitchen, T.B. would sleep on the living room sofa, and the children would share the three bedrooms.

{¶32} A letter from Lincoln Park Academy indicating that the children had been registered for school was presented by T.B. To provide for transportation, T.B. obtained a driver's license to drive D.M.'s car. T.B. and D.M. visited the children from February 2015

until Clayton terminated visitation on May 21, 2015. Clayton explained to T.B. that she was confusing the children by telling them that they could live with her. T.B. receives $300 for child support and $730 monthly for SSI due to her epilepsy, though she testified she has not had seizures for more than 11 years. D.M. stated that he receives $500 to $660 per week from employment, and does not receive social security income as reported by the GAL.

{¶33} T.B. would not allow the parents to visit the children while under the influence of drugs, though Father lives in close proximity to T.B.'s residence. T.B. confirmed Clayton's account of the weekend home visit with the girls, but denied the girls returned with colored, matted hair, adding that the girls bathed daily.

### D. Trial Court's Findings

{¶34} The trial court issued an oral decision after closing arguments. The court emphasized that the decision was driven heavily by the in camera interviews with the children, conducted on two separate occasions, as well as the report of the GAL and the information provided by counsel for the children. The children informed the trial judge that they desired to live in Texas and were not interested in maintaining a relationship with their parents. The court believed the children should remain together because they are very close.

{¶35} The court also voiced concern about the tremendous fear expressed by R.B. about living in Cleveland due to physical abuse he suffered by the paternal grandmother. R.B. did not believe that anyone in Cleveland would protect him. Another important factor in the court's decision was the statement by Clayton that legal custody to K.H. and D.H. was in the best interest of the children for the reason that they did not experience abuse or neglect when with K.H. and D.H.

**{¶36}** The trial court granted legal custody to K.H. and D.H. The trial court also found that the Agency made reasonable efforts to finalize a permanency plan that consisted of legal custody to a relative and the plan was approved and adopted.

**{¶37}** The Agency was granted protective supervision for the sole purpose of facilitating information from the children's therapists to determine reasonable parental visitation. The case was continued for a professionals' conference on that issue.

**{¶38}** Mother now appeals the denial of T.B.'s motion to intervene and grant of legal custody to K.H. and D.H. We affirm the trial court's determination.

## II.    ASSIGNMENTS OF ERROR

### A.    The Trial Court Erred by Failing to Grant the Paternal Aunt's Motion to Intervene

#### 1.    Standard of Review

**{¶39}** The denial of a motion to intervene is reviewed under an abuse of discretion standard. *In re A.S.*, 8th Dist. Cuyahoga No. 102697, 2015-Ohio-4386, ¶ 18. A court abuses its discretion when it acts in an unreasonable, arbitrary, or unconscionable manner. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

#### 2.    Analysis

##### a.    Standing

**{¶40}** We begin with the Agency's jurisdictional challenge to standing. The Agency cites this court's acknowledgment that, while a nonparty generally lacks the right to appeal, "one who has attempted to intervene as a party has the requisite standing [to challenge on appeal]." *In re R.W.*, 2015-Ohio-1031, 30 N.E.3d 254, ¶ 12 (8th Dist.), citing *Januzzi v. Hickman*, 61 Ohio St.3d 40, 45, 572 N.E.2d 642 (1991).

**{¶41}** It is thus true that T.B. has standing to appeal in this case; however, standing is not necessarily exclusive to T.B. In the case of *In re C.B.*, 8th Dist. Cuyahoga No. 92775, 2011-Ohio-5491, we also observed that a child's natural parents are parties to custody proceedings pursuant to R.C. 2151.351 and Juv.R. 2(Y). *Id.* at ¶ 25. Therefore, "[a]n appealing party may complain of an error committed against a nonappealing party when the error is prejudicial to the rights of the appellant." *Id.*, citing *In re Smith*, 77 Ohio App.3d 1, 13, 601 N.E.2d 45 (6th Dist.1991). This court finds that Mother has standing.

**{¶42}** Here, as in *In re C.B.*, Mother's rights were impacted because the record reflects that the award of custody to T.B. would have permitted access to the children by Mother and Father, a situation over which the trial court, the GAL, and the children themselves expressed concern. This court finds that Mother has standing, and our decision on the merits follows.

### b. Motion to Intervene and for Legal Custody

**{¶43}** A nonparty motion is not a proper vehicle for seeking custody in a pending case because only parties may file motions. Juv.R. 2(Y). *In re A.S.*, 8th Dist. Cuyahoga No. 102697, 2015-Ohio-4 386, at ¶ 12. However, the filing of a motion to intervene is appropriate pursuant to Civ.R. 24:[1]

> Under both Juv.R. 2(Y) and Civ.R. 24(B), the trial court has discretion to permit intervention in appropriate circumstances. Under Civ.R. 24(B), the trial court may allow permissive intervention when (1) a statute gives a conditional right to intervene; or (2) an applicant's claim or defense and the main action have a question of law or fact in common.

*In re R.W.*, 2015-Ohio-1031, 30 N.E.3d 254, at ¶ 14.

---

[1] "The Rules of Civil Procedure apply to custody proceedings in juvenile court except when they are clearly inapplicable." *In re H.W.,* 114 Ohio St.3d 65, 2007-Ohio-2879, 868 N.E.2d 261, ¶ 11.

**{¶44}** T.B. is not a party as defined by Juv.R. 2(Y):

"Party" means a child who is the subject of a juvenile court proceeding, the child's spouse, if any, the child's parent or parents, or if the parent of a child is a child, the parent of that parent, in appropriate cases, the child's custodian, guardian, or guardian ad litem, the state, and any other person specifically designated by the court.

*Id.*

**{¶45}** The purpose of Civ.R. 24 is to provide a procedural device for the inclusion of individuals whose presence is required to fully litigate an issue presented in the action. *Id.* at ¶ 16, citing *In re Franklin*, 88 Ohio App.3d 277, 280, 623 N.E.2d 720 (3d Dist.1993). In this case, Father and Mother, the GAL, the Agency, and counsel for the children, all parties as defined by Juv.R. 2(Y), are participating. T.B.'s participation was not required, and her interests were advocated by Mother, Mother's counsel, T.B.'s counsel, and during T.B.'s testimony at the hearing.

**{¶46}** A pivotal issue in permissive intervention is whether intervention is in the best interests of the children. *In re R.W.*, 2015-Ohio-1031, 30 N.E.3d 254, at ¶ 16, citing *In re: B.O.*, 11th Dist. Lake No. 2011-L-055, 2011-Ohio-6210, ¶ 40-41. To that end, Mother argues: (1) the trial court failed to articulate why denying the motion to intervene was in the child's best interest, and (2) T.B. stands in loco parentis because she assumed duties for the parents.

**{¶47}** We reiterate that the children's best interests were well represented by the parties. As the trial court observed, T.B. has never stood in loco parentis for the children, exercised significant control over the children, or assumed parent duties for the benefit of the children.

**{¶48}** The record supports the trial court's finding:

"The term 'in loco parentis' means 'charged, factitiously, with a parent's rights, duties, and responsibilities.'" *State v. Noggle,* 67 Ohio St.3d 31, 33, 1993-Ohio-189, 615 N.E.2d 1040, quoting Black's Law Dictionary (6 Ed. 1990)

787. A person who stands in loco parentis to a child has assumed similar duties to that of a guardian or custodian, only not through legal proceedings. *Id*. In order to meet the definition of in loco parentis, a person must not only assume a dominant parental role, but must also be relied upon by the child for support. *State v. Stout*, 3d Dist. Logan No. 8-07-12, 2008-Ohio-161, ¶ 15, citing *Noggle*, 67 Ohio St.3d 31, 1993-Ohio-189, 615 N.E.2d 1040. Furthermore, "[t]he key factors of an in loco parentis relationship have been delineated as 'the intentional assumption of obligations incidental to the parental relationship, especially support and maintenance.'" *Evans v. The Ohio State Univ*., 112 Ohio App.3d 724, 736, 680 N.E.2d 161 (1996), quoting *Nova Univ., Inc. v. Wagner*, 491 So.2d 1116, 1118, fn. 2 (Fl.1986).

*State v. Burgett*, 3d Dist. Marion No. 9-09-14, 2009-Ohio-5278, ¶ 23.

**{¶49}** The fact that T.B. loves the children is uncontested; however, there is no evidence that T.B. has exercised significant control over or assumed parental duties for the benefit of the children. Thus, T.B. lacks in loco parentis standing and the cited activities performed by T.B., while laudable, do not rise to such a level.

**{¶50}** We also note that, procedurally, T.B. failed to comply with Civ.R. 24(C), which sets forth the procedure for filing a motion to intervene and requires a motion, a supporting memorandum stating the grounds for intervention, and a pleading pursuant to Civ.R. 7(A). "[D]enial of the motion to intervene is warranted on the basis of a failure to comply with the pleading requirement alone." *See State ex rel. Sawicki v. Court of Common Pleas of Lucas Cty*., 121 Ohio St.3d 507, 2009-Ohio-1523, 905 N.E.2d 1192, ¶ 21-22. *Whitehall v. Olander*, 10th Dist. Franklin No. 14AP-6, 2014-Ohio-4066, ¶ 35.

**{¶51}** This court finds that the trial court did not abuse its discretion in denying the motion to intervene. The first assignment of error lacks merit and is therefore overruled.

> **B. The Trial Court Erred by Awarding Legal Custody to the Out-of-State Relatives and Not Awarding Custody to Paternal Aunt, T.B. as such Award of Legal Custody to the Out-of-State Relatives was not in the Children's Best Interest and Not Based on a Preponderance of the Evidence, and therefore, an Abuse of Discretion**

### 1. Standard of Review

**{¶52}** An award of legal custody shall not be reversed on appeal except where there has been an abuse of discretion. *In re M.J.M.,* 8th Dist. Cuyahoga No. 94130, 2010-Ohio-1674.

> To constitute an abuse of discretion, the ruling must be unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). * * * In order to have an abuse of that choice, the result must be "so palpably and grossly violative of fact and logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance thereof, not the exercise of reason but rather of passion or bias."

*Id.* at ¶ 8, quoting *State v. Jenkins*, 15 Ohio St.3d 164, 222, 473 N.E.2d 264 (1984).

### 2. Analysis

**{¶53}** R.C. 2151.011(B)(21) defines legal custody as follows:

> [A] legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.

**{¶54}** Awarding legal custody differs from the protocol utilized to terminate parental rights pursuant to R.C. 2151.353(A)(3)(c):

> For this reason, the standard the trial court uses when making its determination is "preponderance of the evidence." *In re C.V.M.*, 8th Dist. No. 98340, 2012-Ohio-5514, ¶ 7. Preponderance of the evidence means "evidence that's more probable, more persuasive, or of greater probative value." *Id.*, quoting *In re D.P.,* 10th Dist. No. 05AP-117, 2005-Ohio-5097.

*In re E.A.*, 8th Dist. Cuyahoga No. 99065, 2013-Ohio-1193, ¶ 12.

**{¶55}** R.C. 2151.353(A)(3)(c) does not provide a statutory guide governing legal custody proceedings; however, R.C. 2151.414(D) provides guidance. *In re E.A.* at ¶ 13. The statute instructs the court to consider:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).[2]

{¶56} The record sustains the award of legal custody to K.H. and D.H. by a preponderance of the evidence. The GAL, Clayton, and counsel for the children were in zealous support. The children informed the trial judge during their in camera interview that they were excited about returning to Texas.

{¶57} Mother and Father are incapable of parenting the children due to substance abuse issues. Neither parent has made substantial progress on their case plans and the extended circle of

---

[2]   These additional factors include: whether a parent has continuously and repeatedly failed to substantially remedy the conditions causing the child to be placed outside the child's home, and has utilized available resources; whether a parent has chronic chemical dependency that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time; whether the parent has been convicted of or pleaded guilty to certain listed offenses (which are offenses of violence, sex offenses, or offenses against children); whether the parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food; whether the parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times; whether the parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child; whether the parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child.   *In re E.A.* at ¶ 13, fn. 1.

local familial support is not conducive to protecting the children from further neglect and abuse, a concern expressed by the professionals as well as the children.

{¶58} The children are close in age and connected emotionally. Keeping them together is deemed by all parties to be in their best interests. K.H. and D.H. offer a home away from what the children themselves construe as a threatening environment.

{¶59} The Agency continues to maintain protective supervision so the children will be monitored and parental visitation arranged. Further, legal custody does not prevent rehabilitated parents from seeking future custody. *In re D.T.*, 8th Dist. Cuyahoga Nos. 100970 and 100971, 2014-Ohio-4818, ¶ 19.

{¶60} As the trial court explained in rendering its decision:

This decision is based on the custodial history and the abuse and neglect the children experienced while in Cleveland and the concern of some of the children that this abuse and neglect will happen again if they remain in Cleveland in the care of paternal relatives. The children are now expressing hope and happiness that they did not express at the first in camera interview in January.

{¶61} We agree with the trial court's findings. The appellant's second assignment of error is overruled.

{¶62} The juvenile court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Court of Common Pleas, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

MARY EILEEN KILBANE, P.J., CONCURS;
TIM McCORMACK, J., CONCURS IN JUDGMENT ONLY